**CITY OF FESTUS,**
**Plaintiff–Respondent,**

v.

**FESTUS FLYING SERVICE, INC., et al., Defendants–Appellants.**

**No. 52607.**

Missouri Court of Appeals,
Eastern District,
Division Four.

March 29, 1988.

Motion for Rehearing and/or Transfer
Denied May 6, 1988.

Application to Transfer Denied
June 14, 1988.

John V. LaBarge, Jr., Charles W. Riske, Sestric, LaBarge, Korum & Clancy, Kirkwood, for defendants-appellants.

Robert G. Kister, Pannell, Dodson & Kister, Festus, for plaintiff-respondent.

GRIMM, Judge.

In this quiet title action, the tenant, Festus Flying Service, Inc.; a lender, Commerce Bank; and M.F. Long, a subrogee of a lender, Boatmen's Bank, appeal the judgment of the trial court quieting title in the landowner, City of Festus. Although these briefs raise six points, they basically raise four issues. First, that the trial court erred in quieting title in the City and concluding that the surrender of the lease by Service extinguished a claim of Service for $98,000 of "prepaid rent." We disagree, because Service made a voluntary surrender of the lease and thus extinguished all its rights pursuant to the lease. Second, that the trial court erred in quieting title in the City and extinguishing the rights of Commerce. We agree, because Commerce had a valid deed of trust pursuant to the terms of the 1968 lease which was not terminated by the 1979 lease. Third, the trial court erred in quieting title in the City and extinguishing the rights of Long, subrogee of Boatmen's. We agree, because Long, as subrogee of Boatmen's, succeeded to the rights they obtained under its deed of trust. Fourth, that the trial court erred in denying Service the right to recover certain items of property, such as a double wide mobile home, 1000 gallons of aviation fuel, and reimbursement for a bill for snow removal services. We disagree, because the trial court's judgment was not against the weight of the evidence. The judgment, as modified herein, is affirmed.

A review of the facts discloses that the City owned real estate known as Festus Municipal Airport. On April 10, 1968, the City entered into a lease agreement with Service by which Service would operate the airport for the City. The 1968 lease granted to Service: (1) the right to mortgage the leasehold interest to obtain funds for con-

struction and improvements; and (2) that should the original term of the lease expire prior to the term of the lease and not be renewed by the City, the City would pay Service ¹⁄₂₀th of the cost of the buildings for each year short of the 20–year period. The pertinent part of the lease provided:

> ... the operator shall have the right to mortgage the leasehold interest for the term of the original lease and any buildings erected on the premises to obtain funds for construction and improvements under the terms as set out by Exhibit 1 attached hereto. The leasehold interest, if foreclosed under the terms of the mortgage or Deed of Trust shall continue to the (sic) available for public use. Buildings mentioned in Exhibit A and B shall be fully paid for and all debts retired on or before the end of the original lease term.
>
> Any additional buildings the operator may put up from time to time under the terms of the lease, the operator shall have a period of twenty years use to recover his investment. Should the original term of the lease expire prior to the term of the lease and not be renewed by the owner, the owner shall be obligated to pay to the operator ¹⁄₂₀ of the cost of said buildings for each year short of the twenty year period.

The 1968 lease was modified in 1973 and in 1977 but without any substantive change other than extending its terms.

On March 15, 1974, Service borrowed $15,000.00 from Commerce Bank of Festus and executed a promissory note. In order to secure the note, Service granted Commerce a deed of trust which basically conveyed Service's leasehold interest in the airport property to Wallace Hancock as trustee for Commerce. This occurred while the 1968 lease was in effect. The loan proceeds were used to construct a T-hangar.

On July 1, 1977, Service borrowed $100,-000.00 from The Boatmen's National Bank of St. Louis and executed a promissory note. The note was secured by a deed of trust which conveyed all of Service's leasehold interest in the airport property to Sandford Miller as trustee for Boatmen's. The deed of trust to Commerce is not mentioned. This, too, occurred while the 1968 lease was in effect. The proceeds from the loan were used in the construction of an airport hangar.

On May 5, 1979, the City and Service entered into a new lease regarding the airport. The 1979 lease terminated the original lease and all amendments, as well as eliminating Service's obligation to pay monthly rent. The new lease did not allow Service to mortgage its leasehold interest, nor did it contain any provision allowing Service to recover money from the City for improvements in the event of an early expiration of the lease. Neither Commerce nor Boatmen's was a signatory party to the 1979 lease.

In the early 1980's, Service's air freight business, which was its primary income producing business, diminished. As a result, Service experienced cash flow difficulties in 1984.

In March 1984, the City became aware of a published notice stating that a sheriff's sale of Service's interest in the lease was scheduled for March 20, 1984. This sale was pursuant to an execution upon a $200,-000.00 wrongful death judgment obtained by Roy and Jeanette Weast; the Weasts were the high bidder, bidding $1150.00. On March 23, 1984, the Weasts received a Sheriff's Deed conveying "all the right, title, interest, claim, estate and property of" Service in the property to them. The Sheriff's Deed did not refer to either the 1968 lease or the 1979 lease, nor to any interest of Commerce or Boatmen's.

The City recognized that Service had failed to provide insurance certification as required by the 1979 lease. The City, on March 15, 1984, served notice of breach of lease on Service, advising them of their noncompliance with the terms of the lease. A follow-up letter was sent on March 29, 1984.

The City, then, on May 24, 1984, directed a "notice of termination of lease" to Service demanding they vacate the airport premises; the letter referred to the failure to provide insurance and the sheriff's sale.

Service, however, which is unexplained in the record before us, did not vacate, but rather continued to operate the airport without any further complaints from the City, the Weasts, or the banks.

On September 26, 1984, the President and Chief Executive Officer of Service, Howard Williams, sent a notice to its customers that it would discontinue "collecting for the facilities" at the airport. This notice was not sent to the City. On November 29, 1984, in the office of the Mayor of Festus, Williams orally advised Rick Turley, City Administrator of Festus, of his intentions to cease operations at the airport. On November 30, 1984, Service gave written notice to the City that it would "vacate the airport premises as of 5 p.m. on November 30, 1984." Service did vacate the airport that day. The City took immediate possession of the airport and operated it. On December 4, 1984, the City sent a notice to Service, as well as to the Weasts, Boatmen's and Commerce, informing them that the City had taken possession of the airport premises.

At the time Service vacated the airport, it left some aviation fuel in a storage tank, as well as a double wide mobile home. The mobile home had been placed on a foundation, with plumbing and electrical hookups installed. Various other items of personal property were also left on the airport grounds.

Prior to vacating the airport, Service submitted a bill for $643.90 to the City for snow removal. A dispute developed between the City and Service over the bill and this dispute remained unresolved at the time Service ceased operating the airport.

On January 8, 1985, the City filed a quiet title action against Service, the Weasts, Boatmen's, Commerce, and the trustee for each of the banks respectively. On March 20, 1985, M.F. Long, the personal guarantor of the Boatmen's loan to Service, as well as a director of Service, paid Boatmen's $42,061.83 because Service defaulted on its payments. As a result of this payment, Boatmen's assigned and transferred all right, title and interest it had in Service's promissory note and deed of trust to Long. The bank also declared Long's personal guarantee "Paid" and returned the document to him.

The trustees for the banks did not file an answer to the City's quiet title action, nor did they appear or present testimony. Commerce filed an answer, as well as a counterclaim against the City seeking $6,360.07 in money damages. Boatmen's did not file an answer, nor present any testimony. Service filed an answer and a counterclaim, seeking possession of the leasehold, as well as money damages for breach of lease, conversion of personal property and failure to pay for snow removal.

On May 14, 1986, Long filed a motion to intervene as subrogee of Boatmen's. The motion was granted; an answer was filed, as well as a counterclaim against the City seeking money damages of $58,000.00.

Following a non-jury trial, the trial court granted: (1) judgment in favor of the City on its petition to quiet title in the real estate; (2) judgment against Long on his counterclaim for money damages; (3) judgment against Commerce on its counterclaim for money damages; (4) judgment in favor of Service on some items of personal property which included 250 gallons of aviation fuel, but did not include the double wide mobile home, nor payment for snow removal services.

On appeal to this court, a primary issue is whether the trial court erred in quieting title in the City and concluding that the surrender of the lease extinguished a claim of Service for $98,000 of "prepaid rent." Service claims that since it had, through the years, erected improvements at the airport, it should receive some compensation for them. Arguing that in view of the rent abatement provision in the 1979 lease, and the recognition in that lease that the fair rental value of the airport is $6,000 per year, Service seeks a refund of "prepaid rent" of $98,000 (being approximately 16½ years times $6,000 per year).

The pertinent provisions of the 1979 lease are:

[Service] does hereby agree that all improvements made on the property owned by the City of Festus before the date of this Lease and hereafter, including the most recent improvement completed in 1977 at a cost of One Hundred Thirty-six Thousand Dollars ($136,000.00) for an airport hangar, shall become the property of the City of Festus upon the expiration of this Lease or the termination of same in any lawful manner, and that said [Service] shall have no residual interest in said improvements to the City's property.

In consideration of the investment of [Service] in improvements to the realty in excess of One Hundred Thirty-six Thousand Dollars ($136,000.00) during the last two (2) years and the interest paid by [Service] in obtaining the necessary financing for the improvements on said City property, and further with the full expectation and realization that all said improvements revert to and become City property upon the expiration or otherwise lawful termination of said Lease, the City, in lieu of rent, does hereby agree to accept all said improvements made by [Service] to the date of the expiration of this Lease, said expiration date being the 4th day of May, 2002. The City does hereby consider that during the term of this Lease, twenty-three (23) years, that the fair value of said leased property to the City of Festus is Six Thousand Dollars ($6,000.00) per year. This fair rental value is calculated on the basis of an investment of One Hundred Thirty–Six Thousand Dollars ($136,000.00), plus interest, for the term of twenty-three (23) years, expiring on the 4th day of May, 2002.

■ We reject Service's position for several reasons. First, there is nothing in the 1979 lease that places an obligation on the City to pay Service any sum if the 1979 lease is terminated early. Such a provision was in the 1968 lease; it said:

Any additional buildings the operator may put up from time to time under the terms of the lease, the operator shall have a period of twenty years use to recover his investment. Should the origi-

nal term of the lease expire prior to the term of the lease and not be renewed by the owner, the owner shall be obligated to pay to the operator ½₀ of the cost of said buildings for each year short of the twenty-year period.

Since such a provision was in a predecessor lease and is not in the current lease, it must be concluded, when there is no evidence to the contrary, that such omission was intentional. Second, the 1979 lease ended as a result of the voluntary actions of Service, and not as a result of the City terminating the lease. Here, Service advised the City that it would vacate the airport on November 30, 1984. If we placed the obligation on the City to "purchase" the improvements made by Service, then Service would have had a lease from 1979 to 2002 without having paid any rent therefore or making any improvements during that 23 year term. Such a construction is not merited. Here, the lease did not end as a result of the passage of time, but rather was due to the affirmative action of Service of vacating the premises and surrendering the property and the lease to the City.

■ Service actually abandoned the lease when Service vacated the premises on November 30, 1984. Abandonment is largely considered a matter of intention. *Northwest Missouri State Fair, Inc. v. Linville*, 448 S.W.2d 274, 279 (Mo.App.W. D.1969). From the evidence, we conclude that Service meant to abandon the lease. Service sent a letter to the City stating it would cease operations at 5 p.m. on November 30, 1984. It did, and never returned to the premises after November 30, 1984, nor attempted to conduct any airport business. Such surrender or abandonment of possession extinguished all rights which Service may have had under the lease. *Jackson v. Merz*, 223 S.W.2d 136, 139 (Mo. App.E.D.1949). Thus, Service was no longer entitled to any rights it had pursuant to the lease after it abandoned the lease on November 30, 1984.

■ Also, in the context of this first point, Service argues that there was not a

valid surrender of the lease, because the surrender of the lease by Williams was essentially a disposition of the assets of Service not in the ordinary course of business, which required the approval of the board of directors or the approval of a two-thirds majority of the shareholders. Section 351.400 RSMo.1986. We disagree for two reasons: (1) the surrender by Williams was not a disposition of all assets, but rather a termination of the lease Service had with the City; and (2) in effect, there was approval by the board of directors and shareholders. Williams, Williams' mother, Long, and Long's wife, were the only shareholders; they also were the board of directors. Long and his wife held 90% of the stock, with Williams and his mother holding the remaining 10%. Williams consented to vacating the airport when he sent the letter of November 30, 1984, to the City. Long, in effect, conveyed his consent by being at the airport on November 30, 1984, and knowing that the airport was going to close down, and failing to take any steps to continue the operation of the airport. Neither Long, nor his wife, testified that Williams did not have authority to take the steps he did. Thus, we conclude that the action undertaken by Williams was a valid surrender and abandonment and did not violate § 351.400. Point denied.

Commerce alleges that the trial court erred in quieting title in the City, thereby extinguishing its rights under the deed of trust given by Service pursuant to the authority contained in the 1968 lease. In its brief, Commerce asks that we remand the case and direct the trial court to enter judgment "that the lien of the deed of trust of Commerce Bank of Jefferson County N.A. remains in full force and effect; that Commerce Bank be authorized to foreclose its deed of trust or alternatively, in order to avoid foreclosure that the City of Festus pay to Commerce Bank the sum of $6,351.15 ..." Commerce did not raise as a "Points Relied On" the denial of its counterclaim seeking $6,360.07.

The 1968 lease was originally for a term ending on September 26, 1987. However, by agreement of Service and City, that lease was modified on July 15, 1973, to extend it to September 26, 1992. Thus, by virtue of the lease, Service, in 1974, had an interest in the property until September 26, 1992. *Sharp v. W. & W. Trucking Company*, 421 S.W.2d 213, 218 (Mo. banc 1967). The lease specifically gave Service "the right to mortgage the leasehold interest ... to obtain funds for construction." In its context here, the "leasehold interest" was the 1968 lease, as extended. 1 Gill on Missouri Titles, (4th Ed.) § 534. Thus, in 1974, when Service gave Commerce a deed of trust on its leasehold interest, Commerce received a security interest in that property.

█ In 1979, Service and City entered into a new lease, terminating the 1968 lease. The termination of the 1968 lease was effective as between those two parties. However, once there is an intervening interest, such as the deed of trust of Commerce, a surrender of a lease does not bind those not signing. Gill, *Id.* at § 549, *citing Gardiner v. Washington Loan & Trust Co.*, 62 F.2d 869 (D.C.Ct.App.1932). *Cf., Fincher v. Miles Homes of Mo., Inc.*, 549 S.W.2d 848 (Mo. banc 1977). Commerce was not a party to the 1979 lease. As a result, the rights of Commerce under its deed of trust were not affected by the 1979 lease. Thus, the trial court erred in concluding that "When [Service] agreed in 1979 to terminate its rights under the 1968 lease, [Commerce's] interest in the 1968 leasehold estate [was] extinguished."

The judgment of the trial court shall be amended to reflect that the lien of the 1974 deed of trust of Commerce remains in full force and effect, and Commerce shall be authorized to foreclose its deed of trust. However, it must do so pursuant to the 1968 lease. That lease, in authorizing Service to mortgage the leasehold interest, provided that if the leasehold interest was foreclosed, "the leasehold interest ... shall continue to" be "available for public use."

Long claims that the trial court erred in quieting title in the City and extinguishing his rights as subrogee of Boatmen's. In his brief, Long asks that we remand the

case and instruct the trial court "to enter judgment finding that the lien of the deed of trust of Boatman's [sic] Bank of St. Louis held by M.F. Long remains in full force and effect ..., that M.F. Long be authorized to foreclose his deed of trust or alternatively, in order to avoid foreclosure that the City of Festus pay to M.F. Long the sum of $87,627.48, ..." Long did not raise as a "Points Relied On" the denial of his counterclaim seeking $58,500.00.

■ Long, as subrogee of Boatmen's, acquired the rights which Boatmen's had under its 1977 deed of trust, obtained pursuant to the provisions of the 1968 lease previously discussed. What was said about the rights which Commerce have is equally applicable here. Long is correct in saying that the trial court erred in declaring that Long's payment to Boatmen's extinguished the rights under its deed of trust. When Long paid the debt owed by Service to Boatmen's, which he had guaranteed, he was subrogated to all rights of Boatmen's, including its rights under the deed of trust. *Quality Wood Chips, Inc. v. Adolphsen*, 636 S.W.2d 94, 96–97 (Mo.App.W.D.1982).

Long does have the right to foreclose the Boatmen's deed of trust which has been assigned to him. We observe that this deed of trust is second to that of Commerce as to much of the leasehold interest. The judgment of the trial court shall be amended to reflect that the lien of the 1977 deed of trust of Boatmen's, assigned to Long, remains in full force and effect, and Long shall be authorized to foreclose that deed of trust.

Service raises several issues involving its claim for recovery of certain items of personal property. It contends that the trial court erred in finding that: (1) title to a 40 × 60 foot double-wide mobile home had become property of the City; (2) Service left only 250 gallons of fuel at the airport which the City had to return; and (3) there was no evidence presented as to the number of hours expended by Service in snow removal.

We must keep in mind our scope of review. A trial court's judgment in a court tried case is to be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

Service alleges that the title to the mobile home did not pass to the City under the terms of paragraph 3 of the 1979 lease. However, this paragraph of the lease states: "[Service] does hereby agree that all improvements made on the property owned by the City of Festus before the date of this lease and hereafter ... shall become the property of the City of Festus ... and that [Service] shall have no residual interest in said improvements to the City's property." Thus, all improvements made on the property are considered the property of the City upon expiration or termination of the lease.

Service argues that there was evidence presented that (1) the mobile home was not a permanent improvement to the realty, and (2) the mobile home was titled to Williams and Long and not to Service, and therefore could not become property of the City. At trial, Williams stated that the mobile home was the property of Service. Also, Williams, in an inventory prepared for trial, listed the mobile home as one of the items of property Service left at the airport. On the other hand, Williams testified that the title to the mobile home was in his and Long's name and thus was not the property of Service.

■ There is other evidence to support the trial court's finding that the mobile home belonged to the City: (1) the mobile home's wheels had been taken off and the home had been placed on blocks; (2) it had been equipped with permanent plumbing and electricity; and (3) the mobile home had been covered and enclosed completely by a stick built roof structure. This evidence indicates an intention of Service to affix the mobile home to the real estate. *Caltoor v. Wells*, 641 S.W.2d 492 (Mo.App. E.D.1982).

■ Also significant is that neither Williams nor Long filed any pleadings claiming title or ownership of the mobile

home. Even if the trial court had accepted Williams' testimony that the mobile home belonged to Williams and Long, it was not erroneous for the trial court to find that Service had no interest in the mobile home. Long did not appeal the court's determination that the title "passed to the City under the terms of paragraph 3 of the 1979 lease ..." Based on the evidence presented, we hold that the trial court did not err in finding that, as between the parties to this litigation, title to the mobile home passed to the City. Service's claim is denied.

As to Service's other claims, they require only brief comment. The trial court ordered the City to return 250 gallons of fuel to Service. Service challenges the amount of gasoline, claiming that the only evidence at trial showed that 1000 gallons of fuel was left at the airport.

 Service submitted to the trial court a statement of the case with proposed findings of facts and conclusions of law. On page 6 of the statement, Service asked the trial court to find that "The city from and after approximately December 1 of 1984 took possession of ... two hundred fifty (250) gallons of aviation fuel." The trial court, in its findings of fact, adopted the gallon figure suggested by Service. Service cannot now complain about the amount when it was awarded exactly what it requested. Point denied.

 The other claim of Service deals with a bill for snow removal services. Service asserts that the trial court erred in finding that no evidence was presented as to the number of hours expended by Service in snow removal, nor its reasonable value, and concluding that Service did not carry its burden of proof on the issue.

At trial, the only evidence presented by Service was a letter that referred to a charge of $291.90 for parts and 16 man hours of labor at $22.00 per hour. The letter also refers to expenses incurred by Service and concludes it "eats us $35.00 per hour easily, doesn't it." There was no oral testimony given about the snow removal, when it occurred, the time involved, or any information, except for the one letter. The burden of proof rests on the one seeking compensation. *Zeppenfeld v. Morgan*, 168 S.W.2d 971 (Mo.App.E.D.1943). Due to the limited amount of evidence, we hold that the trial court did not err in denying Service compensation for snow removal services. Service's claim is denied.

Respondent's motion for attorneys' fees, which was ordered taken with the case, is denied.

The judgment of the trial court is modified in accordance with this opinion to declare that the deed of trust of Commerce dated March 15, 1974, remains in full force and effect, and Commerce is authorized to foreclose its deed of trust; further that the deed of trust dated July 1, 1977, which Boatmen's assigned to Long, remains in full force and effect, and Long is authorized to foreclose that deed of trust. As modified, the judgment is affirmed.

SIMON, P.J., and CRANDALL, J., concur.